IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EDWARD HARMON,                          *

     Plaintiff,                        *

     v.                                *          Civil Action No. PX 15-2611

UNITED STATES OF AMERICA,               *

     Defendant.                        *
                                    *****

## MEMORANDUM OPINION

Pending in this medical malpractice action are cross-motions for partial summary judgment. *See* ECF Nos. 33, 36. The issues are fully briefed and a hearing was held on Wednesday, September 13, 2017. *See* ECF No. 42. For the reasons stated below, both motions are granted in part and denied in part.

## I.     BACKGROUND[1]

In May 2011, Plaintiff Edward Harmon ("Plaintiff") was diagnosed with Crohn's disease by physicians at the Pediatric Gastroenterology Division of Walter Reed National Military Center ("Walter Reed"). Plaintiff is eligible for care in the military system because his father, Col. Robert Harmon ("Col. Harmon"), is a former military service member. Crohn's disease cannot be cured, only treated with medications that control gastrointestinal inflammation. In May of 2011, several classes of drugs existed to treat Crohn's disease, including mesalamine commonly known by the brand name "Pentasa", 6-mercaptopurine ("6-MP"), immunosuppressants, and biologics. Dr. Phillip Rogers, one of Plaintiff's treating physicians, prescribed Pentasa to Plaintiff on May 26, 2011. A known but rare risk of mesalamine is acute

---

[1] Unless otherwise noted the following facts are undisputed.

interstitial nephritis ("AIN"), an allergic reaction that can inflame and ultimately damage parts of the kidney.

   While on Pentasa, patients such as Plaintiff undergo standard blood tests to monitor kidney function by measuring levels of creatinine,[2] blood urea nitrogen ("BUN"), and glomerular filtration rate ("GFR"). These blood tests are called metabolic panels which can be either comprehensive ("CMP") or basic ("BMP"). Plaintiff's first metabolic panel was completed on May 23, 2011. His creatinine value at that time was 0.9, which is within the acceptable range of .7 to 1.3. His BUN and GFR levels were also normal.

   On October 11, 2011 test results revealed that Plaintiff's creatinine and BUN had increased since May 2011, although the values were still within the acceptable range. Plaintiff then left for college during which time he was not treated at Walter Reed. He returned to military care in October 2012 and attended a series of medical appointments at Walter Reed and Fort Belvoir Community Hospital ("Fort Belvoir") over a six-month period. Plaintiff's claims concern these medical appointments. The Court will only address these encounters generally here, and will leave the details for its discussion of the parties' motions, *infra*.

   On October 12, 2012, Plaintiff met with Nurse Michelle Ackerman ("Nurse Ackerman") at the Fort Belvoir Gastroenterology Clinic. Col. Harmon was present during this appointment. Nurse Ackerman conducted a full workup on Plaintiff and ordered lab work. Plaintiff's labs revealed a significant elevation in his inflammatory markers, indicating cause for concern as to the status of his Crohn's disease. The labs also revealed an elevated creatinine level of 1.6, which is .2 units above the normal range of .7 to 1.4 as well as abnormal BUN and GFR levels. As a follow-up to the blood results, Nurse Ackerman then scheduled a colonoscopy appointment to address his Crohn's inflammation.

---

[2] Creatinine, or serum creatinine, is measured in milligrams per deciliter (mg/dL).

Dr. Benjamin Rodriguez, a clinical fellow, and Dr. Dale Cloyd, a staff gastroenterologist, conducted Plaintiff's colonoscopy on November 20, 2012. The colonoscopy revealed Crohn's inflammation in Plaintiff's GI tract. Drs. Rodriguez and Cloyd discussed the colonoscopy findings and agreed that the Pentasa was not doing enough to keep Plaintiff's Crohn's under control. They therefore increased his Pentasa dosage.

The next month, on December 26, 2012, Plaintiff again visited Dr. Rodriguez in Walter Reed's Inflammatory Bowel Disease ("IBD") clinic. The purpose of the visit was for Plaintiff to establish care in the IBD clinic with Dr. Betteridge, an IBD specialist who now served as Dr. Rodriguez's supervising physician. Dr. Rodriguez observed that Plaintiff's October lab results showed that Plaintiff had an elevated creatinine level and discussed these results with Dr. Betteridge.

Dr. Rodriguez's medical notes from the December 26th appointment included five recommendations to Plaintiff: get new labs drawn, complete a bone density scan, schedule a repeat colonoscopy, get a pneumonia vaccine, and follow up in January to revisit the discussion of initiating 6-MP. The new labs would have allowed the doctors to reevaluate Plaintiff's kidney values. But these labs were never drawn. Plaintiff contends Dr. Rodriguez never instructed him to obtain repeat labs while Defendant argues that Plaintiff was instructed and simply failed to do so.

Regarding Plaintiff's Crohn's disease, Drs. Rodriguez and Betteridge agreed that Plaintiff likely needed to be placed on a stronger medication than Pentasa and decided to discuss with Plaintiff a transition to 6-MP. Plaintiff rejected the move to 6-MP because he was a concerned about burning through too many treatment plans too quickly.[3]

---

[3] The record reflects that Plaintiff may also have been concerned that 6-MP increases the risk of lymphoma, in part because his mother had been diagnosed with lymphoma.

On January 8, 2013, Plaintiff underwent another colonoscopy that identified signs of Crohn's-related inflammation. On January 17th, Dr. Betteridge left a voicemail message for Plaintiff regarding the colonoscopy results and ordered him to follow up soon with Dr. Betteridge in the IBD clinic. Dr. Betteridge did not notify Plaintiff of his abnormal creatinine, BUN, and GFR levels from his October 12th lab work. On January 31st, Dr. Rodriguez reviewed with Plaintiff the colonoscopy results. Plaintiff insisted that he felt "great" and that his Crohn's disease was asymptomatic.

On March 11, 2013, Plaintiff attended an annual physical with Dr. Shawn Corcoran at Fort Belvoir. Although, Dr. Corcoran noted that Plaintiff's elevated creatinine value from his October 2012 labs, the doctor continued Plaintiff on Pentasa because his Crohn's was stable and also ordered Plaintiff to repeat blood tests which were completed the same day. The labs revealed that Plaintiff's creatinine level rose to 3.3 indicating significantly compromised kidney function. Dr. Corcoran, however, did not review the results with Plaintiff until April 3, 2013.

Plaintiff then scheduled an appointment to see a nephrologist at the Walter Reed Nephrology Clinic. Dr. John Thurlow repeated Plaintiff's blood tests, which revealed that Plaintiff's creatinine was even higher, at 4.1. Consequently, Dr. Thurlow diagnosed Plaintiff with Pentasa-induced AIN and discontinued his Pentasa regimen. On April 12, 2013, Plaintiff underwent a kidney biopsy which confirmed that he is suffering from AIN. Plaintiff was also diagnosed with chronic kidney disease.

On September 3, 2015, Plaintiff filed this action against the United States ("Defendant") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, alleging that Defendant, through Walter Reed, Fort Belvoir, and their agents, were medically negligent in failing to diagnose Plaintiff's elevated creatinine on October 2012 as an adverse reaction to

Pentasa. Plaintiff further alleges that his continued use of Pentasa caused AIN and thus permanent kidney damage. *See* ECF No. 1. Plaintiff also alleges that Defendant failed to warn Plaintiff about the risks associated with Pentasa, including AIN. *Id.*

Defendant answered the Complaint on November 17, 2015 and the parties proceeded to discovery. In its answer, Defendant included the affirmative defenses of contributory negligence and assumption of risk. *See* ECF No. 9 at 9–10. On January 17, 2017, Plaintiff filed a partial motion for summary judgment. Defendant filed a cross-motion for partial summary judgment on February 22, 2017. The Court will address each in turn.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by

affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).

Rule 56(a) of the Federal Rules of Civil Procedure permits a party to move for partial summary judgment by identifying "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." A motion for partial summary judgment is recognized as a useful pretrial tool; the Advisory Committee Notes to the 1946 amendment to Rule 56 state: "The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication . . . serves the purpose of speeding up litigation by" narrowing the issues for trial to those over which there is a genuine dispute of material fact. *See also Rotorex Co. v. Kingsbury Corp.*, 42 F. Supp. 2d 563, 570–71 (D. Md. 1999) (internal quotation marks omitted) (noting that "numerous courts have entertained and decided motions for partial summary judgment addressing particular issues.").

With cross-motions for summary judgment, the Court must review each motion separately as to whether either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted). Thus, as with any motion for summary judgment, the court must review the facts and reasonable inferences therefrom in the light most favorable to the party opposing that motion. *Id.*

## III.    ANALYSIS

### A.    Plaintiff's Motion for Summary Judgment (ECF No. 33)

Plaintiff moves for partial summary judgment on Defendant's violation of the standard of care as to the medical negligence claim (Count I) and the negligent breach of duty of informed consent (Count II). He also seeks summary judgment on Defendant's affirmative defenses of

contributory negligence and assumption of risk. Each of these issues will be addressed separately.

**1.     Medical Negligence (Count One)**

In Maryland, to recover for injuries caused by alleged medical malpractice, a plaintiff must prove, by a preponderance of the evidence, (1) the applicable standard of care; (2) that this standard has been breached; and (3) a causal relationship between the violation and the injury. *See Lawson v. United States*, 454 F. Supp. 2d 373, 416 (D. Md. 2006) (citing *Weimer v. Hetrick*, 309 Md. 536, 553 (1987)). Physicians owe a duty to use the care expected of a reasonably competent practitioner of the same class and acting in the same or similar circumstances. *Ford v. United States*, 165 F. Supp. 3d 400, 423 (D. Md. 2016) (citing *Upper Chesapeake Health Ctr., Inc. v. Gargiulo*, 223 Md. App. 772 (2015) (unreported)). Under this standard, the trier of fact must take into account "advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations . . . ." *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 276 Md. 187, 200 (1975). "[T]he defendant's use of suitable professional skill is generally a topic calling for expert testimony . . . ." *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 623 (1969). Plaintiff argues his treating physicians and nurses indisputably breached the applicable standard of care in failing to diagnose and treat Plaintiff's kidney injury over a six-month period from October 12, 2012 to April 12, 2013. The Court will assess each of Plaintiff's claimed breaches in chronological order.

*i.     October 12, 2012 Appointment with Nurse Michelle Ackerman*

Plaintiff's first claimed breach is as to Nurse Michelle Ackerman who failed order repeat labs after the October 2012 labs revealed abnormal levels of creatinine, BUN, and GFR. *See* Nurse Ackerman Dep., Def.'s Ex. 20 at 26–32. Nurse Ackerman conceded in her deposition that

elevations in a patient's BUN and creatinine levels indicate possible kidney dysfunction. *See id.* at 28–29. Yet Ackerman never relayed this concern to Plaintiff. *Id.* at 33–35. Nor did Ackerman take any further steps consistent with concern for adverse kidney function related to the elevated lab results. *See* ECF No. 33-1 at 10; Ackerman Dep., Def.'s Ex. 20 at 37–40. Consequently, Plaintiff's standard of care expert, Kathryn Moghadas ("Moghadas"), concludes that Nurse Ackerman breached the standard of care in four ways. First, she failed to inform Plaintiff of the abnormal labs related to kidney function. Second, she failed to bring the abnormal lab results to the attention of her supervising physician. Third, in addition to failing to notify the attending physician, Nurse Ackerman failed to take any steps to ensure follow up as to kidney dysfunction. Finally, Nurse Ackerman engaged in substandard medical documentation. *See* Moghadas Dep., Def.'s Ex. 14 at 94–102.

Defendant, by contrast, offers no like-kind expert, but merely argues for the exclusion of Moghadas' opinion because it lacks sufficient factual basis. Specifically, Defendant contends that Moghadas failed to take into account Nurse Ackerman's collaborative practice agreement ("CPA"), which, according to Moghadas, defines "the scope that [Nurse Ackerman] can practice under, what she could and could not be allowed to do." *See* Moghadas Dep., Def.'s Ex. 14 at 100. Defendant suggests, without elaboration, that this failure renders Moghadas' testimony excludable under Rule 702 of the Federal Rules of Evidence. *See* ECF No. 36-1 at 35.

Under Rules 104(a) and 702 of the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). To do so, the trial court must confirm that: (1) "the testimony is the product of reliable principles and methods"; (2) "the expert has reliably applied the principles and methods to the facts of the case"; and (3) the

"testimony is based on sufficient facts or data." Fed. R. Evid. 702(b)–(d). The *Daubert* inquiry involves "two guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). "On the one hand, . . . Rule 702 was intended to liberalize the introduction of relevant expert evidence," *id.*, and "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (citing Fed. R. Evid. 702 advisory committee's note). On the other hand, "[b]ecause expert witnesses have the potential to be both powerful and quite misleading,' it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinion." *United States v. Fultz*, 591 F. App'x 226, 227 (4th Cir. 2015) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)).

Defendant contends that because Nurse Ackerman's CPA sets forth the applicable standard of care as it pertains to Ackerman, Moghadas' failure to consider the CPA warrants the drastic remedy of exclusion under Rule 702. Defendant's argument is misplaced.

Moghadas explained that while a CPA may or may not reflect the nursing standards of care, it does not create those standards. *See, e.g.*, Moghadas Dep., Def.'s Ex. 14 at 99 (explaining that while the CPA may establish certain "parameters", the nurse still maintains the responsibility to, for example, notify the attending doctor of any problems).[4] Put differently, the nursing standard of care is based not on the dictates of the CPA, but the medically reasonably steps nurses are expected to take in similar circumstances based on their training, education and experience.

---

[4] Moghadas further clarified on her errata sheet: "I misunderstood the question, I thought you were asking for a specific reference reflecting standards of care. I did not make clear in my answer that the Nurse Practices Act is reflective of the general requirement of the nurse [to] act as a reasonable competent nurse [would] under like or similar circumstances." Errata Sheet, ECF No. 38-10 at 3. *See* Fed. R. Civ. P. 30(e)(1) (permitting "changes in form or substance" to deposition testimony).

Notably, Defendant does not argue that Moghadas' articulated standard of care is wrong or directly at odds with the CPA. But more to the point, even if the CPA is inconsistent with Moghades' articulated standard of care, this alone does not merit exclusion. Moghadas' expert opinion, therefore, is properly before this Court on summary judgment.

Defendant next argues that even if Moghadas' opinion is considered, a material dispute exists as to whether Nurse Ackerman consulted with an attending gastroenterologist on Plaintiff's case and whether she acted consistently with that consultation. *See* ECF No. 36-1 at 35. According to Plaintiff, no record evidence reflects that Nurse Ackerman notified a physician of Plaintiff's abnormal kidney markers. However, Nurse Ackerman did testify that when treating Crohn's patients it is her typical practice to consult with a gastroenterologist to direct the patient's plan of care. Ackerman Dep., Def. Ex. 20 at 36–37.

Construing the evidence in the light most favorable to Defendant, a reasonable factfinder could determine that Ackerman behaved consistently with her habit and practice in this case. To be sure, Plaintiff has much grist for cross examination given that Ackerman could not remember whether she followed her practice here and failed to document any interactions with a gastroenterologist. *Id.* But this is precisely the kind of competing evidence that makes resolution on summary judgment inappropriate. Summary judgment is therefore denied as to Moghadas' opinion that Ackerman violated the standard of care in failing to consult a gastroenterologist.

As to the uncontroverted evidence regarding the remaining alleged violations of the standard of care, Defendant mounts no real challenge. When construing the evidence in the light most favorable to Defendant, no evidence exists that Nurse Ackerman informed Plaintiff of his October 2012 elevated levels, set up a plan of care addressing possible kidney dysfunction or properly documented the above. Rather, Defendant mischaracterizes Moghadas' testimony as a

concession "that NP Ackerman's actions on October 12, 2012 may have been consistent with her collaborative practice agreement." *See* ECF No. 36-1 (citing Nurse Ackerman Dep., Def.'s Ex. 14 at 99:21–100:2). However, Moghades says nothing of the sort. Accordingly, because Defendant can point to no contrary evidence as to Ackerman's remaining standard of care violations, Plaintiff's motion for partial summary judgment is granted as to them.

ii.     *Plaintiff's Medical Appointments from November 2012 to April 2013*

Plaintiff next contends that summary judgment is appropriate as to Drs. Rodriguez, Betteridge, and Corcoran breaching the standard of care in failing to diagnose and treat Plaintiff's AIN from November 2012 to April 2013. It is undisputed that in November 2012, Plaintiff underwent a colonoscopy and medical assessment by his treating physician Dr. Rodriquez and supervisor Dr. Dale Cloyd. Dr. Cloyd testified that Dr. Rodriguez was responsible for reviewing Plaintiff's medical history discussing the same with Cloyd. Dr. Cloyd Dep., Def.'s Ex. 5 at 54–56. Cloyd noted however, that Rodriguez never reviewed Plaintiff's medical records nor share them with him. *See id.* at 56; Dr. Rodriguez Dep., Def.'s Ex. 6 at 85–87 (suggesting that it was not standard to review the lab results prior to the colonoscopy). As a result, Dr. Rodriguez was unaware of Plaintiff's history of abnormal kidney markers while on Pentasa. Based on the colonoscopy results, Dr. Rodriguez increased Plaintiff's Pentasa dosage to treat his Crohn's flair. Dr. Rodriguez Dep., Def.'s Ex. 6 at 86.

On December 26, 2012, Plaintiff saw Dr. Rodriguez and his supervisor Dr. Betteridge for a follow-up appointment. Dr. Rodriguez recommended another round of blood testing, but the tests never came to pass. Medical Record, Pl.'s Ex. 2 at 382. Plaintiff next saw his internist, Dr. Shawn Corcoran, on March 11, 2013. Dr. Corcoran performed a physical examination and reviewed Plaintiff's lab results from October 12, 2012. *See* Dr. Corcoran Dep., Ex. 21 at 38–39.

He agreed that Plaintiff's creatinine and BUN levels were slightly elevated. *Id.* To the best of Plaintiff's recollection Dr. Corcoran did not mention Pentasa as the possible cause of his historic abnormal lab values. *See* Harmon Dep., Def.'s Ex. 3 at 152–53.  During this appointment, Dr. Corcoran ordered repeat labs to be completed that day and verbally told Plaintiff to complete the lab work. These tests revealed significantly worsening renal function including elevated creatinine and BUN values.

On March 24, 2013, Dr. Rodriguez reviewed the March 11th labs and discussed with Plaintiff those results related to his Crohn's disease. Rodriguez, however, did not tell Plaintiff about the metabolic panel results, which included the abnormal kidney markers. Dr. Rodriguez contends that the metabolic panel was not available in the lab results. *See* Dr. Rodriguez Dep., Def.'s Ex. 6 at 154. Four days later, Dr. Corcoran discussed with Plaintiff Crohn's-related lab results but did not tell Plaintiff about the results of the metabolic panel. He testified that Plaintiff's creatinine results were missed for some unknown reason. *See* Dr. Corcoran Dep., Def.'s Ex. 21 at 56 (opining that sometimes computer glitches may prevent the new results from being visible).

Shortly thereafter on April 5, 2013, Dr. John Thurlow of the Walter Reed Nephrology Clinic examined Plaintiff and ordered repeat labs to be completed that day. The labs demonstrated severely elevated kidney markers, leading Dr. Thurlow to conclude that Plaintiff was suffering from renal failure. *See* Medical Records, Pl.'s Ex. 2 at 352–53. Dr. Thurlow removed Pentasa from Plaintiff's medication regimen and scheduled a renal biopsy for April 12, 2013. The renal biopsy confirmed that Plaintiff was suffering from AIN. *See See* Medical Records, Pl.'s Ex. 2 at 87–88.

Plaintiff retained two standard of care experts, Dr. Meyer Solny and Dr. William Stenson, to opine on the physicians' conduct from November 2012 to April 2013. Both are board-certified gastroenterologists and internists and both concluded that Drs. Rodriguez, Betteridge, and Corcoran breached the standard of care in several ways during Plaintiff's treatment. *See generally* Dr. Solny Expert Report, Def.'s Ex. 31; Dr. Stenson Expert Report, Def.'s Ex. 32. Specifically, regarding Plaintiff's November 20, 2012 colonoscopy, Plaintiff's experts opine that Dr. Rodriguez breached the standard of care by (1) failing to review Plaintiff's previous lab results; (2) failing to repeat Plaintiff's blood work immediately and call a nephrologist; (3) failing to inform Plaintiff that the lab work suggested that his renal function was diminished; (4) failing to stop the Pentasa regimen pending confirmation as to whether Pentasa was causing the kidney dysfunction; and (5) increasing the dosage of Pentasa. *See* ECF No. 33-1 at 39; Def.'s Ex. 31; Def.'s Ex. 32.

Regarding the December 26, 2012 follow-up appointment with, Plaintiff's experts concluded that Drs. Rodriguez and Betteridge breached the standard of care by failing to procure repeat labs after realizing Plaintiff had abnormal kidney values; failing tell the Harmons that there may be a problem with Plaintiff's kidney function; and failing to discontinue Plaintiff's Pentasa regimen. *See* Def.'s Ex. 31; Def.'s Ex. 32.

Plaintiff's experts also concluded that Dr. Rodriguez breached the standard of care during his January 31st phone call with Plaintiff. At that point, Dr. Rodriguez had access to Plaintiff's earlier abnormal creatinine levels but did not discontinue Pentasa, never communicated to Plaintiff the significance of his abnormal labs, and did not inquire as to why the December 26 labs had not been completed. *See* Dr. Stenson Dep., Def.'s Ex. 9 at 119–20.

Plaintiff's experts opine that Dr. Corcoran breached the standard of care during the March 11, 2013 appointment and the March 28th phone call by failing to (1) act on the March 11, 2013 lab results; (2) inform Plaintiff of the correlation between kidney dysfunction and Pentasa; and (3) order the discontinuance of Plaintiff's Pentasa regimen. *See id.* Plaintiff also alleges that Dr. Rodriguez breached the standard of care during a March 24, 2013 phone call and Dr. Corcoran breached the standard of care during a March 28, 2013 phone call for these same reasons. *See id.*

Defendant first argues that the Court should exclude the expert reports and testimony of Drs. Stenson and Solny because Plaintiff's counsel ghost wrote the reports. Defendants specifically point out that both experts acknowledged their reports are identical and that neither wrote it. Consequently, Defendants urge this Court to exclude their opinions entirely.[5]

Rule 26 of the Federal Rules of Civil Procedure requires expert witnesses to prepare their own Rule 26 Reports. The advisory committee notes accompanying this Rule clarify, however, that a report is still "prepared and signed by the witness," even if counsel aides the witness in preparing it. Specifically, the advisory committed notes provide that:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Fed. R. Civ. P. 26, Advisory Committee Notes.

In *Trigon Ins. Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001), the United States District Court for the Eastern District of Virginia canvassed the law on the permissible degree of

---

[5] "Ghost writing a testifying expert's report is the preparation of the substance writing of the report by someone other than the expert purporting to have written it." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 291 (E.D. Va. 2001).

outside involvement in the preparation of expert reports. Its analysis is instructive. The *Trigon* court, relying on *Marek v. Moore*, 171 F.R.D. 298 (D. Kan. 1997), determined that for the report to satisfy Rule 26, it (1) should be written in a manner that reflects the testimony to be given by the expert witness; and (2) must be signed by the expert. *Trigon Ins. Co.*, 204 F.R.D. at 292. It also analyzed *Indiana Ins. Co. v. Hussey Seating Co.*, 176 F.R.D. 291 (S.D. Ind. 1997), in which the expert testified at his deposition that the plaintiff's attorneys prepared his Rule 26 disclosure. The *Hussey* court went on to observe, "[f]ortunately for Plaintiff, the [expert's] deposition did not conclude on the spot," as the expert then testified that, among other things, he had personally prepared the nine opinion reports and the work papers attached to the Rule 26 disclosure. *Id.* at 292. Because the expert had personally prepared the heart of the disclosure—the attachments consisting of his opinions and work papers—the court determined that the expert's report satisfied Rule 26. In addition, the expert had drafted the portion of the report that included his opinions and bases for them. *Id.* at 292–93.

*Trigon* also addressed *Manning v. Crockett*, 1999 WL 342715 (N.D. Ill. 1999). In *Manning*, the plaintiffs' expert signed a report that was "remarkably similar" to the plaintiffs' complaint, although written in narrative form. *Id.* at *1. The plaintiffs' counsel also signed the report. *Id.* There, the Court concluded that,

> *Marek* and *Hussey*, as well as the advisory committee notes to Rule 26(a)(2), stand for the proposition that some attorney involvement in the preparation of an expert report is permissible, but that the expert must also substantially participate in the preparation of his report. Thus, certain kinds of help are clearly in tune with the concept of assisting the expert discussed in *Marek*, *Hussey*, and the advisory committee notes. Specifically, an attorney's assistance with the preparation of documents required by Rule 26, such as a list of cases in which the expert has testified, or fine-tuning a disclosure with the expert's input to ensure that it complies with the rules is permissible.

*Manning*, 1999 WL 342715, *2–3.

The *Manning* court refused to strike the report, contrasting the facts in *Manning* with the circumstances in which counsel had "ghost-written" a report "from whole cloth" and asked the expert to sign it as if it were his own. *Id.* at 3 ("Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement.")

> In other words, the assistance of counsel contemplated by Rule 26(a)(2)(B) is not synonymous with ghost-writing. The court thus disagrees with the Manning's belief that "no rule . . . prohibits an expert from adopting the precise language alleged in a complaint" in his report.

*Manning*, 1999 WL 342715, at *2–3. The court further reasoned that, "[a]llowing an expert to sign a report drafted entirely by counsel without prior substantive input from an expert would read the word 'prepared' completely out of the rule." *Id.*

Furthermore, if opinions expressed in an expert report are not the opinions of the expert, the expert cannot satisfy the requirements of Fed. R. Evid. 702 and *Daubert* that the report be based on the expert's own valid reasoning and methodology. *See* Fed. R. Evid. 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, in (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

Here, Drs. Stenson's and Solny's reports are almost identical. *Compare generally* Stenson Expert Report, Def.'s Ex. 31, *with* Solny Expert Report, Def.'s Ex. 32. And certain

paragraphs of their reports appeared to be lifted directly from the complaint. *Compare* ECF No. 1 at ¶ 31.i, *with* Solny Expert Report, ECF No. 32 at ¶ 9. Plaintiff's counsel confirmed that they drafted the reports. *See* ECF No. 38-1 at 22; Solny Dep., Def.'s Ex. 8 at 104; Stenson Dep., Def.'s Ex. 9 at 17–18.

However, the experts also confirmed that they signed the reports only after concluding that they reflect the opinions each doctor holds. *See* Solny Dep., Def.'s Ex. 8 at 104–05; Stenson Dep., Def.'s Ex. 9 at 17–18. Both experts also explained that even though they were invited to edit the reports, no edits were necessary as the reports accurately reflected their conclusions supported by a "blind review" of the relevant medical records. *See* ECF No. 38-1 at 21–22; Hall Aff., ECF No. 38-12. In this circumstance, that the experts did not actually draft the reports is relevant more to the weight of the evidence rather than its admissibility. *Cf. Transcon. Gas Pipeline Corp. v. Societe d'Exploitation du Solitaire, S.A.*, No. 05-1295, 2007 WL 2712936, at *4 (E.D. La. Sept. 13, 2007) ("Defendants [sic] argument regarding 'ghost-writing' goes more to the weight of the evidence, rather than its admissibility."). Accordingly, while it may be ill-advised for an attorney to take such an active role in drafting the Rule 26 report, the extreme sanction of exclusion is not warranted here.

Defendant alternatively argues that the experts' testimony should be excluded under Rule 702 because the opinions erroneously assume that Plaintiff's acute interstitial nephritis was active before February 2013 even though no confirmatory medical evidence supports that assumption. *See* ECF No. 36-1 at 42. Defendant likewise argues that without such proof of AIN prior to February 2013, any possible violations of the standard of care occurring before that time "could be causally related to his injury," and so would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Defendant's argument again misses the mark. Critically, Plaintiff does not allege that Defendant's physicians breached the standard of care by failing to diagnose Plaintiff's with AIN earlier. Rather, Plaintiff argues that the physicians breached the standard of care by failing to warn Plaintiff of the risks associated with Pentasa, failing to recognize Plaintiff's abnormal kidney markers, and failing essentially to take any steps to mitigate Plaintiff's apparent kidney injury. In support, Drs. Solny and Stenson, along with Plaintiff's causation expert, Dr. Gehr, all conclude that the adverse effects of Pentasa are reflected in Plaintiff's abnormal lab results dating back to 2012, and that Plaintiff's treaters simply missed it. *See* Solny Dep., Def.'s Ex. 8 at 131–33; Stenson Dep., Def.'s Ex. 9 at 115–16; Gehr Dep., Def.'s Ex. 16 at 17–18. Because Defendant has marshalled no evidence disputing that Plaintiff's treating physicians breached the standard of care as described above, summary judgment is granted.

Defendant next argues that summary judgment should be denied because genuine disputes of material fact exist as to whether Dr. Rodriguez's decision to increase Plaintiff's Pentasa dosage at the November 2012 appointment breached the standard of care. Defendant points defense expert Dr. Eric Blum's inability to opine on whether Dr. Rodriguez's decision to increase Plaintiff's Pentasa dosage was reasonable because "[t]here is a lack of consistent documentation" to determine the cause of Plaintiff's elevated creatinine level. *See* Dr. Blum Expert Report, Def.'s Ex. 30. As Dr. Blum explained in his deposition, if hypothetically Dr. Rodriguez had determined that a non-drug-related factor such as a Crohn's-induced dehydration caused Plaintiff's abnormal levels of creatinine, then Dr. Rodriguez' decision to increase Plaintiff's Pentasa dosage did not breach the standard of care. *See* Dr. Blum Dep., Def.'s Ex. 13 at 93–94.

However, Dr. Blum agreed that Dr. Rodriguez knew or should have known that Plaintiff exhibited an elevated creatinine level during the November 20th colonoscopy, *See* Blum Dep., Def.'s Ex. 13 at 92. In fact, Dr. Blum agreed that Dr. Rodriguez's failure to determine whether Pentasa was the cause of Plaintiff's abnormal lab results violated the standard of care. *See* Blum Dep., Def.'s Ex. 13 at 99–104. Dr. Blum further opined that increasing the Pentasa dosage without learning of Plaintiff's elevated creatinine level itself violated the standard of care. Dr. Blum also agreed that Dr. Rodriguez breached the standard of care by failing to order repeat labs, *see id.* at 93, and by failing to warn Plaintiff about the significance of his elevated creatinine levels, *id.* at 101. Because no genuine issue of disputed material fact exists as to these acts and omissions, Plaintiff is entitled to summary judgment on Dr. Rodriguez having breached the standard of care.

Next, Defendant argues that a material dispute of fact exists as to whether Dr. Rodriguez told Plaintiff on December 26, 2012 to repeat his blood tests. Neither party can specifically recall whether Dr. Rodriguez ordered Plaintiff to complete these labs. *See* Harmon Dep., Def.'s Ex. 3 at 88 (explaining that he could not remember whether he was instructed to get labs done). *See* Dr. Rodriguez Dep., Def.'s Ex. 6 at 126, 173. However, Plaintiff's medical records for the December 26, 2012 show that Dr. Rodriguez recommended that additional labs should be completed. *See* Medical Records, Pl.'s Ex. 2 at 382. If Dr. Rodriguez told Plaintiff to get repeat labs done and Plaintiff failed to do so, Defendant argues that the failure to draw repeat labs could be partially attributable to Plaintiff. *See* ECF No. 36-1 at 36 (citing Dr. Blum Expert Report, Def.'s Ex. 30). Construing the evidence in the light most favorable to Defendant, a genuine dispute of material fact exists as to whether Dr. Rodriguez instructed Plaintiff to undergo

additional lab testing. Plaintiff's motion for summary judgment is therefore denied with respect to this alleged breach.

However, Defendant does not directly address the other alleged breaches of standard of care, namely Dr. Rodriguez' failure to inform Plaintiff of his abnormal creatinine values indicative of kidney dysfunction possibly caused by Pentasa, or Dr. Rodriguez's failure to discontinue the Pentasa regimen. Defendant's own expert, Dr. Blum, in fact agreed in his deposition that these failures amount to a breach of the standard of care. *See* Dr. Blum Dep., Def.'s Ex. 13 at 117–21. Defendant does point out that Dr. Rodriguez testified that he was aware of Plaintiff's elevated creatinine and performed a differential diagnosis to isolate its cause. Specifically, he testified that he asked Plaintiff whether he was taking any creatine supplements, which could elevate his creatinine level. He also discussed with Plaintiff that the elevated creatinine value could be a side-effect of his Crohn's disease, his Pentasa usage, or a lab error. *See* Dr. Rodriguez Dep., Def.'s Ex. 6 at 117–21. But nowhere in his testimony does Dr. Rodriguez state that he informed Plaintiff that his elevated creatinine values are indicative of kidney dysfunction. Accordingly, Plaintiff is entitled to summary judgment regarding Dr. Rodriguez' course of care during the December 26th appointment.

Defendant does not mount a serious challenge to the physicians' conduct in January 2013. And Defendant's own expert confirmed that Dr. Rodriguez breached the duty of care when he failed to ask Plaintiff why he had not completed the December 26 labs during the January 31st telephone conversation. *See* Blum Dep., Def.'s Ex. 13 at 133–39. Therefore, Plaintiff is entitled to summary judgment with respect to Dr. Rodriguez's breach of the standard of care in during the January 2013 phone call as well.

Defendant also contests whether summary judgment is appropriate as to whether Dr. Rodriguez violated the standard of care when he failed to disclose to Plaintiff during a March 24, 2013 phone call the abnormal creatinine levels as well as the associated risks of Pentasa, and his failure to discontinue Pentasa in light of the abnormal creatinine levels. Defendant argues that the doctor could not have disclosed abnormal results because the tests he ordered on December 26 had not been performed and so were not available for review during the call. *See* ECF No. 36-1 at 37–38 (citing Dr. Rodriguez Dep., Def.'s Ex. 6 at 153–54 (explaining that the creatinine lab results were not available before the March 24 telephone call with Plaintiff)). This is a red herring. Plaintiff's medical records show that that Plaintiff's metabolic panels from October 12, 2012 and March 11, 2013 were available to Dr. Rodriguez review before the March 24, 2013 call. *See* Nurse Ackerman Dep., Def.'s Ex. 20 at 24–26; Dr. Young Dep., Pl.'s Ex. 11 at 87–88; 97–99. Indeed, the medical records audit trail more specifically reveal that Plaintiff's March 11 lab results were sent to Dr. Rodriguez. *See* Audit Trial, Pl.'s Ex. 16 at USA-01452. Thus, Dr. Rodriguez at least had access to Plaintiff's labs that revealed his abnormal creatinine levels, but nonetheless the doctor did not inform Plaintiff of these results. Dr. Blum testified at his deposition that Dr. Rodriguez's failure to notify Plaintiff of any abnormal creatinine results if Dr. Rodriguez reviewed the labs would be a breach of the standard of care. Dr. Blum Dep., Def.'s Ex. 13 at 101–02. At the hearing, Defendant conceded that Dr. Rodriguez breached the standard of care by failing to review Plaintiff's entire file before the phone call. *See* September 13, 2017 (3:36–3:37).[6] Accordingly, Dr. Rodriguez breached the standard of care as a matter of law in this respect.

---

[6] Neither side requested a transcript of the September 13, 2017 motions hearing. The Court therefore uses as a citation the recording of the time as listed on *FTR Gold*, the Court's digital recording system.

Lastly Defendant argues that Plaintiff's motion for summary judgment as to Dr. Corcoran's alleged breach of the standard of care must fail. Plaintiff's experts opine that Dr. Corcoran breached the standard of care by failing to warn Plaintiff about the October 12, 2012 and March 11, 2013 abnormal test results, failing to disclose the risk of kidney dysfunction associated with Pentasa, and failing to discontinue Pentasa. *See* ECF No. 33-1 at 42. *See also* Dr. Stenson Expert Report, Def.'s Ex. 32 at 2 (explaining that Dr. Corcoran breached the standard of care on March 11 and March 28 by failing "to consider Pentasa-induced interstitial nephritis, discontinue Pentasa or refer [Plaintiff] to a nephrologist"). Defendant argues genuine disputed facts exist as to whether Dr. Corcoran's delay in observing Plaintiff's lab results was attributable to him because March 11th metabolic panel was "missed for some unknown reason." *See* ECF No. 36-1 at 37. The Court agrees as to Corcoran's failure to disclose these specific test results. Construing the evidence in the light most favorable to Defendant, Dr. Corcoran's failure to review Plaintiff's March 11 metabolic panel until April may not be attributable to him. Defendant's Designated Representative, Kenneth Mize, testified that the medical provider who enters the labs into the system is the only one who receives a notification when those labs are completed. *See* Mize Dep., Pl.'s Ex. 12 at 49–52. The audit trail shows that Plaintiff's March 11 metabolic panel was entered into the system as ordered by Dr. Rodriguez, not Dr. Corcoran. *See* Audit Trial, Pl.'s Ex. 16 at USA-01452. Therefore, Plaintiff's motion is denied with respect to the alleged breach on March 28, 2013.

However, this may be a pyrrhic victory because the motion is granted as to Corcoran's other breaches. Indeed no dispute exists that Corcoran knew about and did not disclose the October 12 abnormal results, nor did he warn of Pentasa's risks or discuss stopping the Pentasa regimen. *See, e.g.*, Dr. Solny Expert Report, Def.'s Ex. 31; Dr. Corcoran Dep., Def.'s Ex. 21 at

26–28. Accordingly, as to the remaining challenged aspects of Dr. Corcoran's violation of the standard of care, summary judgment is granted.

To conclude, genuine disputed issues of material fact exist as to whether: (1) Nurse Ackerman consulted with a gastroenterologist after the October 2012 appointment, (2) Dr. Rodriguez breached the standard of care when he failed to instruct Plaintiff to undergo repeat lab testing during the December 26, 2012 follow-up appointment and (3) Dr. Corcoran breached the standard of care by failing to notify Plaintiff of his March 11, 2013 lab results during the March 28th phone call. However, no genuine issue of disputed material fact exists as to Defendant's physician's breach of the standard of care in all other respects.

**2.     Informed Consent (Count Two)**

Under Maryland law, "the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." *Sard v. Hardy*, 281 Md. 432, 439 (1977); *see also Robertson v. Iuliano*, No. RDB-10-1319, 2012 WL 6138441, at *2 (D. Md. Dec. 10, 2012). To fulfill this duty, a physician must disclose "the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment." *Sard*, 281 Md. at 440 (citation omitted). A plaintiff must also produce evidence of a causal nexus between the physician's breach of her duty and the plaintiff's claimed damages. *Id.* at 448 ("All courts recognizing the doctrine of informed consent require proof of proximate causation.").

Here, Plaintiff seeks summary judgment as to Defendant's negligent breach of informed consent when Plaintiff's treating physicians failed to inform him that: (1) his October 12, 2012, metabolic panel revealed abnormal levels of creatinine, BUN and GFR; (2) these levels indicate kidney dysfunction; (3) the October 12 creatinine and BUN levels had increased significantly from his May 2011 baseline; (4) risks associated with Pentasa include kidney dysfunction consistent with these abnormal labs; and (5) alternative medications that treat Crohn's without the known side effect of kidney damage. *See* Dr. Solny Expert Report, Def.'s Ex. 31; Dr. Stenson Expert Report, Def.'s Ex. 32; Dr. Stenson Dep., Def.'s Ex. 9 at 44–48 (describing other medications used to treat Crohn's disease). As with his negligence claim, Plaintiff does not seek summary judgment as to causation and damages. *Cf.* ECF No. 33-1 at 2–4 ("In Plaintiff's opinion, the sole issue requiring trial is causation and damages.").

Defendant mounted no direct opposition to this Count in its briefing. At the September 13th motions hearing, counsel for Defendant argued first that the Defendants' physicians received Plaintiff's informed consent when Dr. Rogers discussed with Plaintiff Pentasa's known side effects when he initially prescribed it in May 2011. Indeed, there the medical record from that visit states that Dr. Rogers discussed "Potential Side Effects with Patient [of various prescribed drugs] who indicated understanding." Def.'s Ex. 18. As Plaintiff points out, however, his informed consent claim is based on the decision of Plaintiff's subsequent physicians to continue Plaintiff's Pentasa regimen in the face of medical evidence that the drug was actually harming his kidneys, without informing Plaintiff that drug carries within it a risk of kidney dysfunction. In other words, this Count has nothing to do with the mesalamine-related warnings Dr. Rogers may have given to Plaintiff when he initially prescribed the drug.

Next, Defendant argued that the subsequent physicians had no duty to warn Plaintiff of the side effects of a drug that was prescribed by a previous physician. Notably, Defendant provided no legal support to limit the informed consent doctrine in this way. *Cf. Shannon v. Fusco*, 438 Md. 24, 47 (2014) (explaining that "in a breach of informed consent count, a patient complains that a healthcare provider breached a duty to obtain effective consent to a treatment or procedure by failing to divulge information that would be material to his/her decision about whether to submit to, *or to continue with*, that treatment or procedure.")(internal quotations and citation omitted) (emphasis added). Plaintiff is therefore entitled to summary judgment as to the negligent breach of the duty of informed consent on Count II.

**3.     Affirmative Defenses**

Plaintiff next seeks to preclude the Defendant's affirmative defenses of contributory negligence and assumption of the risk.  With regard to contributory negligence, "[u]nder Maryland law, contributory negligence results 'whenever the injured person acts or fails to act in a manner consistent with the knowledge or appreciation, actual or implied, of the danger or injury that his or her conduct involves.'" *Sheller v. Woods*, No. RDB-08-3501, 2010 WL 2428754, at *2 (D. Md. June 8, 2010) (quoting *Faith v. Keefer*, 127 Md. App. 706, 745 (1999)). The defense of contributory negligence must satisfy the same elements and burden of proof that attach to an ordinary claim of negligence asserted by a plaintiff. *Id.* (citing *Moodie v. Santoni*, 292 Md. 582, 586–87 (1982)). If the defense is established, the plaintiff is completely barred from recovery. *See Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 451 (1983). The principals governing this affirmative defense are fully applicable in medical malpractice cases. *See Dehn v. Edgecombe*, 152 Md. App. 657, 671 (2003). It may be proven where there is evidence that "a patient unreasonably delays in obtaining medical testing, examination, or

treatment as directed or prescribed by the treating physician." *Id.* However, "[a] plaintiff's negligence bars recovery only if the negligence was a proximate cause of the injury or accident." *Germain v. Norris*, 536 F. Supp. 2d 585, 590 n.7 (D. Md. 2008).

Defendant's contributory negligence defense centers on Plaintiff's alleged failure to follow through with blood tests in December of 2012 as Dr. Rodriguez instructed, as well as Plaintiff's delay in scheduling a follow-up visit with Dr. Betteridge after his January 2013 colonoscopy. Plaintiff's only argument is that no evidence exists that he was directed for follow up testing in December 26, 2012. The Court disagrees. Dr. Rodriguez's medical notes reflect that he ordered Plaintiff for follow up tests at the December 26 appointment. Accordingly whether Dr. Rodriguez actually communicated this instruction to Plaintiff is quintessentially a question of fact left for the jury to resolve. Thus, Plaintiff's motion for summary judgment is denied with as to the affirmative defense of contributory negligence.

With regard to assumption of the risk, a defendant must show that the plaintiff "(1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *ADM P'ship v. Martin*, 348 Md. 84, 91 (1997) (citations omitted). In Maryland, assumption of risk is a rarely successful endeavor in medical malpractice suits. *Schwartz v. Johnson*, 206 Md. App. 458, 475 (2012); *see also Newell v. Richards*, 323 Md. 717, 730 (1991). In *Schwartz v. Johnson*, the Maryland Court of Special Appeals underscored that "assumption of risk has been recognized as a defense in medical malpractice cases in certain discrete factual circumstances: (1) where the patient refused treatment suggested by a physician; and (2) where the patient elects to follow unconventional medical treatment." *Schwartz*, 206 Md. App. at 475–76 (footnote omitted). The Court explained:

> The rationale for the limited viability of the assumption of risk defense in a
> medical malpractice action may be explained by the elements of the defense itself;

for a person to "assume the risk," he or she must have had knowledge of the risk of the danger, appreciated that risk, and voluntarily accepted that the risk could occur. *See ADM P'ship*, 348 Md. at 90–91. Therefore, in the healthcare context, for a patient to have "assumed the risk" of a negligent medical procedure, he or she must have voluntarily accepted the risk that the doctor would negligently complete the procedure. Such a factual scenario, however, will almost never occur.

*Id.* at 480. Accordingly, the *Schwartz* Court concluded that, "[i]n our view, for a court to hold that a patient assumed the risk of a physician acting negligently in a medical procedure is 'tantamount to a finding that the [physician] owed no duty' to the patient." *Id.*

Defendant argues that Plaintiff assumed the risk of ongoing injury caused by Pentasa when he refused to switch to 6-MP to treat his Crohn's in December of 2012 at Drs. Rodriguez and Betteridge's urging. *See* ECF No. 36-1 at 43. Drs. Rodriguez and Betteridge admitted that they suggested the switch because Pentasa was not adequately treating his Crohn's disease, and not because Pentasa was causing injury to Plaintiff's kidneys. *See* Betteridge Dep., Def.'s Ex. 10 at 86–88. More to the point, Drs. Betteridge and Rodriguez never told Plaintiff that Pentasa could injure his kidneys or that the use 6-MP does not present similar risks. In short, no evidence exists that Plaintiff knew or appreciated the risk associated with continuing Pentasa. Thus, construing the evidence in the light most favorable to Defendant, insufficient evidence exists to support an assumption of the risk defense, and so Plaintiff's partial motion for summary judgment must be granted.

**B.      Defendant's Partial Motion for Summary Judgment (ECF No. 36)**

Defendant moves for partial summary judgment asserting that no evidence supports (1) any violations in the standard of care before October 12, 2012 or after March 28, 2013; (2) that any violations of the standard of care prior to March 11, 2013 caused Plaintiff's injury; (3) damages. Plaintiff conceded that he is not making any negligence claims against Defendant for

actions occurring prior to October 12, 2012 and after April 2, 2013. *See* Pl.'s Responses to Requests for Admission, Def.'s Ex. 33 at 2. Therefore, Defendant's motion for summary judgment is granted in this respect. The remaining two arguments will be addressed in turn.

## 1.    Causation

Defendant argues that it is entitled to summary judgment regarding its allegedly negligent conduct occurring prior to February 2013 because Plaintiff cannot demonstrate that this conduct caused Plaintiff's injury. Specifically, Defendant argues that Plaintiff's April 2013 biopsy demonstrates that the onset of Plaintiff's acute interstitial nephritis ("AIN") occurred shortly before the biopsy, around February or early March, 2013. Three kidney pathologists reviewed Plaintiff's biopsy report—Dr. Baker, the original treating pathologist who examined the tissue; Dr. Cinthia Drachenberg, Defendant's expert pathologist; and Dr. Helen Liapis, Plaintiff's expert pathologist. All of them agreed that Plaintiff was suffering from AIN as a result of his Pentasa usage, and that his AIN began in February 2013. *See* Drachenberg Report, Def.'s Ex. 27 at 2; Dr. Liapis Report, Def.'s Ex. 17 at 3. Defendant concludes that because Plaintiff did not develop AIN until February 2013 at the earliest, Defendant's physicians' conduct before then is unrelated to his injury. Defendant also argues that Plaintiff's abnormal kidney values before February 2013 can be attributed to mild dehydration resulting from Plaintiff's active Crohn's disease or was simply a side effect of active Crohn's disease. ECF No. 36-1 at 25.

Plaintiff counters that the injury to his kidneys began when he was placed on Pentasa in May 2011 and steadily progressed to AIN in February 2013. He notes that Dr. Thurlow, the physician who diagnosed Plaintiff with AIN in April 2013, concluded that Plaintiff's creatinine levels steadily increased from 1.6 in October 2012 to 3.3 in March 2013, and that "the rising [creatinine] is concurrent with starting Pentasa." Pl.'s Ex. 2 at 354. The nephrologists who

treated Plaintiff after he was diagnosed with AIN concluded that Plaintiff's AIN was associated with his Pentasa usage. Pl.'s Ex. 2 at 156 (June 3, 2015 appointment with Dr. Wondaye Deressa); *id.* at 254 (May 19, 2014 appointment with Dr. James Oliver); *id.* at 278 (November 27, 2013 appointment with Dr. Jorge Martinez-Osorio).

Plaintiff's causation expert, Dr. Helen Liapis, agreed that Plaintiff's elevated creatinine was mesalamine-induced. Plaintiff's Pentasa usage not only explains his elevated creatinine levels in February 2013, but, according to Dr. Liapis, explains the gradual increase of his creatinine levels from the start of his Pentasa therapy in 2011. *See* Dr. Liapis Report, Def.'s Ex. 17 at 3. She opines that Plaintiff suffered from a slowly developing kidney injury from Pentasa, which started as an acute tubular injury ("ATI"), but progressed to AIN at about the time that the significant creatinine increase was detected in February 2013. *Id.* She claims that her "opinion is corroborated by the published cases that state that interstitial nephritis secondary to Meselamine toxicity takes 6 months to years of drug exposure prior to causing severe kidney injury and clinical symptoms." *Id.* at 3–4. Dr. Liapis also explains that Plaintiff's Crohn's disease does not explain his elevated creatinine levels because there is no evidence of dehydration in the record and Plaintiff's creatinine level significantly decreased after Plaintiff stopped taking Pentasa, suggesting a correlation between the two.

Defendant counters that Dr. Liapis's theory to be unreliable and therefore excludable under Fed. R. Civ. P. 702 because the medical literature on which Dr. Liapis relies is flawed. Additionally, Defendant's expert nephrologist, Dr. Ugarte, discredited Dr. Liapis's theory that mesalamine can cause ATI. *See* ECF No. 36-1 at 25–27. Dr. Drachenberg similarly concluded that there is no evidence that mesalamine has been associated with ATI. *See* ECF No. 36-1 at 27; Drachenberg Dep., Def.'s Ex. 12 at 79–81.

Rule 702 requires trial judges to admit expert testimony only where there the putative expert's methodology satisfies that two-prong test for reliability and relevance. *See Adams v. NVR Homes, Inc.*, 141 F. Supp. 2d 554, 565 (D. Md. 2001). "A reliable expert opinion must be based on scientific, technical or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (emphasis omitted). To satisfy Rule 702's "reliability" prong, expert testimony "must be supported by appropriate validation." *Daubert*, 509 U.S. at 590; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). A court will not "credit an expert witness who 'testified to no customs of the trade, referred to no literature in the field, and did not identify [relevant principles],' but merely gave 'his own subjective opinion.'" *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 (4th Cir. 1997) (quoting *Alevromagiros v. Hechinger*, 993 F.2d 417, 421 (4th Cir. 1993)).

In determining whether scientific expert evidence properly satisfies the reliability component of the test, the Supreme Court in *Daubert* held that a trial court should consider several factors: (1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used; and (4) the degree of the method's or conclusion's acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593–94; *United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995). However, the reliability analysis is flexible, tailored to the facts and opinions presented to the district court. *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995) ("*Daubert* clearly vests the district courts with discretion to determine the admissibility of expert testimony."). *McKerrow v. Buyers Prod. Co.*, No. CCB-14-2865, 2016 WL 1110303, at *3 (D. Md. Mar. 22, 2016).

Defendant questions the relevance of the medical literature Dr. Liapis used to conclude that mesalamine can cause ATI. Indeed, Dr. Liapis concedes that "ATI seems to be a rare or underreported mesalamine complication." However, this supposed weakness in Dr. Liapis' "methodology is the proper subject of cross examination, not the basis for summary judgment."[7] *Dierker v. Eagle Nat. Bank*, 888 F. Supp. 2d 645, 658 (D. Md. 2012); *Cf. Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). To further support her opinion, Dr. Liapis also considered and rejected Defendant's theory that Plaintiff's elevated creatinine levels prior to February 2013 was Crohn's-related, finding no evidence in the medical record of dehydration. *Foster v. Legal Sea Foods, Inc.*, No. CCB-03-2512, 2008 WL 2945561, at *10–11 (D. Md. July 25, 2008) (noting the general acceptance of a medical expert's use of the differential diagnosis and explaining that a medical expert conducts an appropriate differential diagnosis by first ruling out alternative causes). Accordingly, the Court declines to exclude Dr. Liapis' opinion at this stage.

Defendant next argues that it is entitled to partial summary judgment regarding Dr. Rodriguez's decision to increase Plaintiff's Pentasa dosage. The parties do not dispute that kidney injury due to Pentasa is "dose-independent." *See* Dr. Liapis Expert Report, Def.'s Ex. 17 at 3; Dr. Liapis Dep., Def.'s Ex. 2 at 175–76; ECF No. 38-1 at 13. That is, a patient who is sensitive to Pentasa will experience a negative reaction regardless of the dose of the medication given. It also means that even if a reaction is already underway, increasing the dosage of the medication does not increase the severity of the reaction. *See* Dr. Liapis Dep., Def.'s Ex. 2 at

_____

[7] Furthermore, this Court is reluctant at the summary judgment stage to exclude Dr. Liapis without a more robust *Daubert* hearing. Defendant is permitted to move in limine for such a hearing at a later date.

111. Dr. Rodriguez' increasing Plaintiff's Pentasa dosage, therefore, did not affect Plaintiff's injury. Defendant's motion on this discrete issue is therefore granted.

## 2.     Damages

Plaintiff's claimed damages center largely on his future life care expenses arising from his permanent kidney dysfunction. Sharon Reavis, Plaintiff's life care expert, calculated Plaintiff's future expenses as $2.5 million largely relying on the opinion of Dr. Todd Gehr, Plaintiff's treating and expert nephrologist, as to Plaintiff's future medical needs. *See* Reavis Expert Report, Def.'s Ex. 24. Plaintiff's economic expert, Thomas Borzilleri, then calculated the net present value of Plaintiff's future care to equal approximately $3.3 million. *See* Borzilleri Expert Report, Def.'s Ex. 29. Finally, Charles Thomas, a social work consultant, calculated that Plaintiff will likely miss work because of the medical treatment he will have to undergo for the remainder of his life. *See* Thomas Expert Report, Def.'s Ex. 28.

Defendant challenges the admissibility of Dr. Gehr's opinion, arguing that it is unreliable as to Plaintiff's claimed rate of kidney decline and thus excludable under Fed. R. Civ. P. 702. Specifically, Defendant highlights Dr. Gehr's testimony that Plaintiff's rate of decline may fluctuate over the years, which could affect if and when Plaintiff may require a kidney transplant. *See* Dr. Gehr Dep., Def.'s Ex. 16 at 100–104. Defendant similarly highlights Dr. Gehr's concession that as of March of 2016 when he authored his report, he did not have sufficient diagnostic data to opine on Plaintiff's rate of decline. *See id.* at 107–08.

The Court disagrees with the defendant. Dr. Gehr unequivocally testified that Plaintiff's kidney dysfunction "will progress to end stage renal disease despite our best efforts." Dr. Gehr Dep., Def.'s Ex. 16 at 106–08. Dr. Gehr further testified that he based the rate of decline on his thirty years of training, education and experience as a treating nephrologist. *See id.* at 69–81, 92–

93. That Dr. Gehr candidly admitted to likely refining his timeline for Plaintiff's rate of decline based on future testing, *see id.* at 100–01, does not undermine the validity of his opinion, although subsequent testing may provide additional fodder for cross examination at trial. Along these lines, the parties discussed at the hearing that Dr. Gehr will rely on testimony produced after his deposition to refine his opinion at trial.[8] Accordingly, Defendant's motion for summary judgment is denied as to Plaintiff's claimed damages.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is granted in part and denied in part. It is denied regarding Nurse Ackerman's alleged breach for failing to consult her attending physician and notifying the attending physician of Plaintiff's abnormal lab work. It is also denied with respect to Dr. Rodriguez's alleged breach for failing to order Plaintiff to complete repeat lab work on December 26, 2012 and Dr. Corcoran's alleged breach on March 28, 2013. The motion is granted in all other respects regarding Defendant's breach of the duty of care. With respect to both Counts One (medical negligence) and Two (informed consent), Plaintiff did not move for summary judgment as to causation and damages. Regarding Defendant's affirmative defenses, Plaintiff's motion is denied with respect to the defense of contributory negligence but is granted with respect to assumption of risk.

Defendant's motion for partial summary judgment is also granted in part and denied in part. It is granted as to any alleged acts of negligence prior to October, 12, 2012 and after April 2, 2013. It is also granted to the extent Plaintiff asserts that Dr. Rodriguez's decision to increase Plaintiff's Pentasa dose on December 26, 2012 was a breach of the standard of care. The motion is denied in all other respects. A separate Order follows.

---

[8] The parties agreed that Defendant may re-depose Dr. Gehr on the new lab results in advance of trial.

9/15/2017                                          /S/
Date                                    Paula Xinis
                                        United States District Judge